# United States Court of Appeals
## For the First Circuit

No. 15-2144

UNITED STATES OF AMERICA,

Appellee,

v.

MARK J. ZIMNY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

John M. Thompson, with whom Linda J. Thompson, Robert F. Hennesey, and Thompson & Thompson, P.C. were on brief, for appellant.

Vijay Shanker, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom Carmen M. Ortiz, United States Attorney, Victor A. Wild, Assistant United States Attorney, Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, were on brief, and William D. Weinreb, Acting United States Attorney, Victor A. Wild, Assistant United States Attorney, Kenneth A. Blanco, Acting Assistant Attorney General, and Trevor N. McFadden, Deputy Assistant Attorney General were on supplemental brief, for appellee.

October 3, 2017

**THOMPSON**, **Circuit Judge**. This is the third and final installment in a trilogy of published decisions in the direct appeal from a judgment of conviction entered against the defendant, Mark J. Zimny. In the opener, we remanded for the district court to conduct an investigation into a colorable allegation of juror misconduct. See United States v. Zimny (Zimny I), 846 F.3d 458, 470-72 (1st Cir. 2017). In the sequel, we addressed Zimny's request for bail pending appeal. See United States v. Zimny, 857 F.3d 97, 98-101 (1st Cir. 2017). Now, in the finale, we tackle Zimny's new claim that the district court erred in conducting its juror-misconduct investigation, as well as the two remaining issues upon which we reserved judgment in Zimny I, 846 F.3d at 460 & n.1, 472-73. In the end, we affirm Zimny's conviction.

### BACKSTORY

The facts giving rise to this case are recounted in detail in Zimny I and need not be repeated here. Here's the gist of what happened: While operating an educational-consulting business, Zimny reached out to the Chows, a couple living in Hong Kong who hoped to send their two teenage sons to elite boarding schools. Id. at 460. Zimny told the Chows that the schools that they were targeting were prejudiced towards Asian applicants and that, to overcome that prejudice, applicants needed to make "development contributions" — bribes by another name — to the schools. Id. To prevent the appearance of malfeasance, Zimny

- 3 -

explained, these contributions needed to be made through an intermediary, and his business was the perfect cover. On five separate occasions, Zimny requested that the Chows wire him money that he would then pass along to the schools in the form of development contributions. Id. The Chows did as instructed, but Zimny didn't hold up his end of the bargain; instead of sending the funds to the schools as promised, Zimny pocketed the money, using it for a host of personal expenses. Id. at 460-61. The Chows eventually discovered Zimny's deceit, and the federal government initiated this prosecution soon thereafter.[1] Id. at 461. We'll provide additional background as necessary in our analysis of the issues that Zimny raises.

**ANALYSIS**

In its present form, this appeal raises three issues. First, Zimny contends that the district court's post-remand juror-misconduct investigation was inadequate. Second, he argues that the district court's denial of his pretrial motion for a continuance deprived him of his Sixth Amendment right to counsel of choice. Finally, he insists that the bank-fraud counts were improperly joined and that the district court erred in denying his motion to sever those counts. We address these issues one by one, first setting forth the necessary background for each before

---

[1] We'll elaborate on the charges and the procedural history in a bit.

- 4 -

providing our take. And just a head's up: Zimny makes several arguments for each issue, and consideration of all of these arguments necessitates close examination of the particulars of this case.

### A. Juror-Misconduct Investigation

#### 1. Setting the Stage

Our opinion in Zimny I exhaustively chronicled the backstory behind the juror-misconduct allegation, see id. at 461-64, and we see no need to parrot that background here. It suffices to say that someone who claimed to have been a juror at Zimny's trial commented on a blog post, suggesting that another juror, "[Juror No. 8]," had exposed her colleagues to prejudicial information on the blog during trial. Id. at 464, 467-68.[2] The additional-juror comment, which surfaced after Zimny was convicted, read as follows:

> Boy this is getting comical. I've been following it on and off, and was also on the jury. Mama June [a reference to Juror No. 8], and those who were there know what I'm talking about, was spouting about the "shots in the dark" blog since day one. Its [sic] why she conveniently got "sick" and didn't finish her service. Several other jurors told her to stfu and got annoyed. "[I]diot" doesent [sic] describe the half it [sic].

We determined that Zimny, relying on the additional-juror comment, raised a colorable claim of juror misconduct that required an

---

[2] In Zimny I, we referred to this blog-post comment as "the additional-juror comment," 846 F.3d at 464, and we shall do the same in this opinion.

investigation by the district court, and, because the court initially declined to investigate it, we remanded so that the required investigation could take place. Id. at 470, 472.

On remand, the district court, with the agreement of both parties, first sought to determine the author of the additional-juror comment by identifying the device from which that comment was posted. The postal inspector assigned to this task reported that the comment had been posted using an internet protocol (IP) address associated with an internet service provider in Singapore. Because obtaining the specific IP address user information would require a lengthy and difficult process, the court decided that it would instead bring the jurors in for questioning.

The court questioned each of the thirteen other jurors individually in the presence of the attorneys.[3] The court developed, with input from both parties, a script for the interrogation.

At the hearing, the court asked all of the questions, allowing the parties to submit proposed additional questions at the conclusion of the court's initial questioning of each juror. Each juror was shown a copy of the additional-juror comment, and

_____

[3] The court declined to question Juror No. 8 — who the court had initially questioned soon after trial and before we decided Zimny I — a second time.

- 6 -

each testified that he or she had never seen it before. Each juror was also asked whether the events alleged in the additional-juror comment occurred and whether a juror was spouting about the blog. Also, because of the Singapore-based IP address used to post the additional-juror comment, the court asked the jurors whether they travelled outside the United States since the end of the trial. Each juror testified either that he or she had not travelled outside of the United States or that his or her international travel did not include stops in Asia.

Juror No. 1 testified that, one or two days after the trial ended, he conducted an internet search that led him to the blog. He also testified that he did not author any comments to this blog post. Juror No. 4 testified that, at some point before deliberations began, she remembered hearing "somebody" — she could not remember who — say "that there was something posted on a blog."[4] She also testified, however, that she "didn't hear what it was about, or anything" and that she didn't "think [the speaker] said what it was about."

After the hearing, the district court issued a comprehensive written decision setting forth its findings and

_____

[4] Juror No. 4 testified that she didn't "know whether it was online or a blog" and that she was using the terms "online" and "blog" "kind of interchangeably."

conclusions.[5]  The court explicitly found that: each juror was credible; the author of the additional-juror comment was not a juror; no juror misconduct occurred; Juror No. 8 was not "spouting about" the blog post to her fellow jurors; and the jurors had not been exposed to the blog post during their service.

After the district court issued its decision, we permitted the parties to file supplemental briefs.  The parties did so, and, in his supplemental brief, Zimny raises a host of issues with the district court's investigation.

## 2.  Our Take

We review the district court's response to allegations of juror misconduct for abuse of discretion.[6]  See id. at 464. This deferential standard of review allows the district court wide latitude to determine the precise manner in which to investigate colorable allegations of juror misconduct.  Id. at 465, 472.  "The

---

[5] Before issuing the decision, the district court provided the parties with the opportunity to submit proposed findings of fact and conclusions of law.  Despite indicating his desire to do so, Zimny never filed this document.

[6] Although Zimny seems to concede as much in his opening supplemental brief, he offers a somewhat different argument in his supplemental reply brief.  In that filing, he argues that "the standard of review is controlled by the mandate rule of the law of the case doctrine."  (Capitalization omitted.)  This argument appears to rest on the mistaken premise that Zimny I imposed an obligation — independent of conducting the investigation into whether the allegations of juror misconduct occurred — on the district court to adequately gauge the jurors' memories; as we explain below, our opinion in Zimny I did no such thing.

touchstone is reasonableness:  did the trial court fashion, and then even-handedly implement, a sensible procedure reasonably calculated to determine whether something untoward has occurred?" Id. at 465 (quoting United States v. Paniagua-Ramos, 251 F.3d 242, 249-50 (1st Cir. 2001)).  In the end,

> [s]o long as the district judge erects, and employs, a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out [her] findings with adequate specificity to permit informed appellate review, [her] "determination that the jury has not been soured deserves great respect [and] . . . should not be disturbed in the absence of a patent abuse of discretion."

United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990) (fourth alteration in original) (citation omitted) (quoting United States v. Hunnewell, 891 F.2d 955, 961 (1st Cir. 1989)).[7]

"[A] trial court's findings on issues of juror credibility and honesty are determinations peculiarly within a trial judge's province and are accorded great deference."  Faria v. Harleysville Worcester Ins. Co., 852 F.3d 87, 90 (1st Cir. 2017) (internal quotation marks omitted) (quoting Amirault v. Fair, 968

---

[7] Zimny claims that the phrase "patent abuse of discretion" is incompatible with the standard of review set out in United States v. Bradshaw, 281 F.3d 278, 291 (1st Cir. 2002).  We disagree.  In Bradshaw, this court explained, citing both Boylan and Hunnewell (both of which we have just quoted), that we "test the trial court's handiwork against the abuse-of-discretion benchmark."  Id.  We then added that "[i]n this context, however, review for abuse of discretion connotes a certain rigor."  Id.  We see no inconsistency in our case law regarding the governing standard of review.

F.2d 1404, 1405 (1st Cir. 1992) (per curiam)). "[A]bsent objective evidence that contradicts a witness's story or a situation where the story itself is so internally inconsistent or implausible that no reasonable factfinder would credit it, 'the ball game is virtually over' once a district court determines that a key witness is credible." United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015) (citation omitted) (quoting Rivera–Gómez v. de Castro, 900 F.2d 1, 4 (1st Cir. 1990)).[8] Along similar lines, we uphold a district court's findings of fact unless they are clearly erroneous. See United States v. Tejeda, 481 F.3d 44, 52 (1st Cir. 2007).

Within this deferential framework, Zimny's arguments do not succeed. Generally speaking, he attacks the court's: (a)

---

[8] Zimny argues — without any citation to authority — that, because the district court did not say why it credited each of the jurors, the court's "indiscriminate credibility finding puts this [c]ourt in as good a position to evaluate credibility as the district court was." To the extent that Zimny means to suggest that we need not defer to the court's credibility determinations, we reject this argument out of hand. Our deference to credibility determinations reflects the stark differences between district-court judges — who have a front-row seat in which to observe a witness's demeanor and inflection while testifying — and the judges of this court — who are far removed from the action in the trial court and can review only a cold appellate record — when it comes to assessing whether a witness is telling the truth. See, e.g., Guzmán-Batista, 783 F.3d at 937; United States v. Lowe, 145 F.3d 45, 49 (1st Cir. 1998) ("The trial judge is in the best position to assess a potential juror's credibility by observing her demeanor, reaction to questioning, and overall behavior on the stand."); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985); United States v. Meader, 118 F.3d 876, 881 (1st Cir. 1997).

failure to adequately probe the possibility that juror memories have faded; (b) factual findings; (c) questioning of Juror No. 1; (d) limitations on the involvement of defense counsel; and (e) failure to question Juror No. 8 and the blog's host.  We address each of his several arguments in turn.

### a.    Faded Memories

Zimny complains that the district court's inquiry of the jurors was insufficient to explore the possibility that jurors' memories had faded since trial.  He faults the court for declining his request to "question the jurors about their memories of the trial events in general, to provide a context and baseline sense of the robustness of individual memories against which the strength of their memories of the specific events at issue could be evaluated."  He also complains about the court's failure to "make any findings regarding the adequacy of the jurors' memories of what occurred in the jury room during the trial before deliberations."

But, contrary to Zimny's insistence, the purpose of the remand was not "to investigate the potential that the jurors' memories may have faded in the interim since trial."  Rather, the purpose of the remand was to determine whether the juror misconduct alleged in the additional-juror comment actually occurred.  Zimny I, 846 F.3d at 472 ("We remand with instructions that the district court conduct an investigation into the juror-misconduct

- 11 -

allegations raised in the additional-juror comment. Specifically, the district court must ascertain 'whether [this alleged] misconduct actually occurred and[,] if so, determine whether it was prejudicial.'" (alterations in original) (quoting United States v. Rodriguez, 675 F.3d 48, 58 (1st Cir. 2012))). The district court's inquiry was appropriately focused on this objective. We viewed the prospect of faded memories in Zimny I as something that would be confirmed or refuted in the course of fulfilling the purpose of the remand — not as the purpose in itself. Id. ("[T]he district court's inquiry will readily reveal whether memories have faded . . . ."). Even so, Juror No. 4's testimony that she remembered hearing "somebody" say "that there was something posted on a blog," but could not remember the speaker does little to support Zimny's conclusion that Juror No. 8 was spouting about the blog post given that Juror No. 4 also testified that she "didn't hear what [the blog post] was about, or anything."

### b. The District Court's Findings

#### (i)

Zimny's first challenge to the district court's findings is an offshoot of his faded-memories complaint: He argues that the questioning of the jurors demonstrated that their memories had faded and that these faded memories undermine the court's finding that the jurors were not exposed to the blog during their service. We disagree.

- 12 -

Each juror was asked whether the events alleged in the additional-juror comment occurred and whether a juror was spouting about the blog.  Of the thirteen jurors who were questioned, ten testified unequivocally that the allegations in the additional-juror comment did not occur.  Of these ten, three referenced memory in the course of answering one or two, but not all, of the critical questions they were asked.[9]  We reject Zimny's characterization of these answers as reflecting a general failure of memory on the part of these three jurors; read in context, their testimony gives no hint that the allegations in the additional-juror comment occurred.

---

[9] When Juror No. 2 was asked whether any of the events alleged in the additional-juror comment occurred, he responded, "To the best of my memory, I believe one person did get sick and didn't come back, one of the jurors."  The district court then asked, "Nothing else that is described there?"  Juror No. 2 testified: "No.  The only thing I remember is one of the jurors got sick, I believe, a couple of times or cancelled one day or couldn't get here, or something."  Along similar lines, when Juror No. 6 was asked whether another juror was spouting about the blog or whether any jurors discussed the blog while he was in the jury room, he testified, "Not that I can remember" and "Not that I remember." Finally, during the course of Juror No. 11's testimony, the following exchange occurred:

THE COURT:     Was there any discussion in the jury room of any blog called Shots In The Dark or --

[JUROR]:          No, absolutely not.

THE COURT:     What was it called? -- Harvard Admissions Lawsuit?

[JUROR]:          No, not that I -- not that I recall, no.

- 13 -

That leaves three jurors. The answers of two of them were of the "not that I can recall" variety.[10] But nothing in their testimony suggests in any way that the allegations in the additional-juror comment actually occurred. Finally, Juror No. 12 simply was unaware of whether a juror was spouting about the blog because he was reading a magazine and so "wasn't paying attention . . . until [the jurors] really started to discuss the case seriously." But even his testimony establishes at least that Juror No. 8 was not spouting about the blog to him.

In these circumstances, the district court did not clearly err in concluding that Juror No. 8 was not spouting about the blog post and that the jurors were not exposed to the blog post during their service.

---

[10] When Juror No. 1 was asked whether "something like [Juror No. 8 spouting about the blog] occur[red] in the jury room," he testified, "Not that I recall, and I didn't give -- I didn't communicate much with the juror who got sick, whether or not she was sick in quotes or sick in actuality. I didn't communicate with her." When the district court asked a follow-up question about whether Juror No. 1 heard Juror No. 8 "making comments about Mr. Zimny or about the trial or anything like that," he testified, "Not that I recall, no." Similarly, when Juror No. 13 was asked similar questions about whether there was a discussion about what a juror might have learned from "online activity" or whether there was any discussion about the blog, she responded with the following similar answers: "To my knowledge and my remembering, no"; "Not that I know of"; "No, because I've never heard of that blog"; "Not that I remember and not that I know of"; and "Not that I know of and not that I remember or recall."

Zimny next argues that the district court's finding that the alleged juror misconduct did not occur is unsupported because the court failed to question the jurors about whether they were exposed to the substance of what was discussed in the blog-post comments; instead, the court asked only whether the jurors were familiar with the "Shots in the Dark blog" or the "Harvard Admissions Lawsuit blog." For several reasons, we are unpersuaded.

At the outset, it appears to us that Zimny never raised this issue to the district court. The script — which Zimny concedes was "developed with input from the parties" — asked the jurors whether the events described in the additional-juror comment occurred, and the court's questions of the jurors largely followed suit. And Zimny has not pointed us to any spot in the record where he raised this substance-of-the-blog issue with the district court, and we see nothing in our review of the record to suggest that he ever did so.

In any event, even if the issue had been preserved, Zimny mischaracterizes the questions that the district court asked. The court did not, as Zimny claims, ask merely whether the jurors were "aware of" or "familiar" with the blog. Instead, the court asked every single juror whether the events described in the additional-juror comment occurred and whether there was a juror spouting about the blog. And we see no abuse of discretion in the court's framing

of this question.  After all, the additional-juror comment did not say that Juror No. 8 was "spouting about," to use Zimny's words, "some of the scurrilous things said about Zimny on that blog." Instead, the additional-juror comment alleged that Juror No. 8 was "spouting about the 'shots in the dark' blog since day one."  It was not an abuse of discretion to ask the jurors about that precise allegation.

### (iii)

Zimny also takes issue with the district court's finding that a juror was not the author of the additional-juror comment, contending it is not supported by the jurors' testimony.  We disagree.  Every juror was asked whether they had ever before seen the additional-juror comment — and the author necessarily saw it — and each responded that he or she had not.[11]  So that's that.[12]

---

[11] And that's not all.  After Zimny raised the distinction between questions about familiarity with the court's exhibit of the additional-juror comment and questions about familiarity with the contents of the additional-juror comment — which strikes us as a hair-splitting gripe — the court explicitly asked several jurors whether they were familiar with the <u>contents</u> of the additional-juror comment; once again, each juror who was asked that question unequivocally testified that he or she was not familiar with the comment's contents.  What's more, the court asked some jurors whether they knew who may have posted or authored the additional-juror comment, and those jurors all stated that they did not.

[12] In a similar vein, Zimny faults the district court for declining his request to ask jurors about their computer skills. Because a user can manipulate the identity of the IP address being used, the argument goes, "[i]nquiry into computer skills and savvy rather than [post-trial] travel was much more likely to be productive."  But determining whether a juror was computer savvy enough to manipulate an IP address was relevant only to determining

### c.   Questioning of Juror No. 1

Zimny also nitpicks the court's questioning of Juror No. 1.  Although Juror No. 1 testified that he had visited the blog a day or two <u>after</u> Zimny's trial ended, Zimny argues that the juror's answer about why he visited the blog — "to find out what was going on" — suggested that he was not being truthful.  Here's what Zimny has to say about this:  "Because [Juror No. 1] knew what had gone on in the trial[,] his answer implies he expected to see something about the trial on the blog, suggesting that he was returning rather than visiting the blog for the first time."  And the court, in Zimny's view, erred in not pursuing this "inviting lead."  We disagree.

Zimny's argument about the truthfulness of Juror No. 1's testimony is speculative at best.  What's more, it runs headlong into the court's explicit determination that Juror No. 1 was credible — a determination that we will not disturb.  <u>See</u> <u>Faria</u>, 852 F.3d at 90; <u>Guzmán-Batista</u>, 783 F.3d at 937.

Zimny also complains that, despite Juror No. 1's testimony that he spoke with Juror No. 8 during the trial, the district court did not ask him about the substance of any of these

---

whether the juror authored the additional-juror comment, and the district court's direct questioning on this subject, when coupled with its determination that each juror was credible, amply grounds the court's determination that the author of the additional-juror comment was not a juror.

conversations. But Juror No. 1 testified that he "didn't communicate much with" Juror No. 8, and, when asked whether he heard her make any comments about "Zimny or about the trial or anything like that," he responded, "Not that I recall, no."

Zimny's final gripe about the court's questioning of Juror No. 1 is that the court failed to ask him whether he had the ability to access the internet in his employer's Singapore office. But Juror No. 1 was asked point-blank whether he posted any comments on the blog, and he responded that he did not. So enough said about that.[13]

### d. Limitations on Defense Counsel's Involvement

Zimny also claims that the district court's refusal to let the attorneys question the jurors directly "was unwarranted." But "[c]ounsel has no right to pose specific questions to a juror or to pursue every desired avenue of inquiry. The control and direction of a court's investigation into juror misconduct is within the discretion of the district court, not defense counsel." United States v. Ortiz-Arrigoitia, 996 F.2d 436, 443 (1st Cir. 1993).

---

[13] Zimny also lodges similar complaints about the court's failure to ask similar follow-up questions to Juror No. 10, who, like Juror No. 1, spoke with Juror No. 8 during trial and worked for an employer who had an office in Singapore. But Juror No. 10 testified that he had never heard of the blog before his testimony and that he had "no idea" who authored the additional-juror comment, and the court found him to be credible.

Along similar lines, Zimny complains that counsel's opportunities to suggest questions were unfairly limited and that the court unjustifiably refused to pursue some of Zimny's suggested lines of inquiry. Here's what happened: After the court concluded its initial questioning of each juror (and, don't forget, the attorneys had helped formulate the script of questions), the court permitted defense counsel to submit proposed follow-up questions; defense counsel did so for each and every juror. And the court frequently incorporated Zimny's suggestions into its inquiry. On multiple occasions when the court did not do so, the court made clear that, in its view, its questions already adequately covered the subjects with which Zimny was concerned, that Zimny's proposals were overbroad or irrelevant, or that Zimny had been given ample opportunity to suggest general questions in the script-drafting process. Based on our review of the record, we conclude that the district court's questions adequately covered the relevant remand inquiry. Therefore, we see no abuse of discretion in either the district court's assessment of the presented questions or in the court's refusal to incorporate Zimny's pined-for questions into its juror probe.

### e. Failure to Question Juror No. 8 and Blog Host

Zimny faults the district court for not questioning Juror No. 8 a second time. The district court stated that it would call Juror No. 8 "if we need [to]," but deemed further questioning

- 19 -

of Juror No. 8 — recall the court had questioned her shortly after the verdict and before Zimny I — to be unnecessary in light of the testimony of the other thirteen jurors and the court's finding that no juror misconduct occurred. No hint of discretionary abuse here.

Relatedly, Zimny argues that the district court improperly refused to question Richard Bradley, the host of the blog on which the additional-juror comment was posted. In Zimny's view, "[i]t is reasonable to infer that Bradley knew, or could discover, who posted the additional[-]juror comment." That position appears to be based on the following reasoning:

- On March 24, 2015, an anonymous commenter reported in a comment to the blog post that Bradley had been subpoenaed by defense counsel.

- Two days later, in a different blog post, Bradley wrote: "I did want to let folks know that, yes, as some of you have figured out, I was subpoenaed because of this blog. The subpoena . . . came as a result of comments made on a post about the trial of Mark Zimny . . . ." In this post, Bradley voiced his frustration about the inconvenience of this ordeal.

- Therefore, Zimny reasons, "[a] reasonable inference is that Bradley communicated with one of his commenters about the [Juror No. 8] investigation."

We agree with the district court's assessment that there is "no evidence in the record" to support Zimny's assertion that Bradley might have knowledge about the identity of the author of the additional-juror comment. For starters, Zimny's assertion that Bradley was communicating with one of the commenters seems speculative; Bradley's blog post indicated that he was simply confirming what "some of [the followers of his blog] ha[d] figured out." And, even if it's true that Bradley was communicating with one of the many commenters, it is once again pure speculation to assert that, simply because he might have been communicating with one person who commented on the blog, he therefore knew or could determine the identity of any of the commenters, including the author of the additional-juror comment. Moreover, even if Bradley might have had such knowledge, the district court questioned each of the jurors, and all denied ever seeing — let alone authoring — the additional-juror comment. In light of this clear and consistent testimony, the district court did not abuse its discretion in refusing to question Bradley.

* * *

Summing up, the district court acted well within its discretion in conducting its inquiry into the colorable allegation of juror misconduct, and its finding that the alleged misconduct did not occur is supportable and will not be disturbed. So we soldier on to discuss the issues we bypassed in Zimny I.

- 21 -

### B.    Denial of Continuance Motion

#### 1.    Setting the Stage

Before the grand jury returned the second superseding indictment in April 2014, Zimny's trial on the first superseding indictment was initially scheduled for October 28, 2013.  The district court continued the trial date to February 3, 2014, at the request of Zimny's first attorney because a tax analysis had not been prepared or produced by the government.  Less than two weeks before the rescheduled trial date, Zimny's first attorney moved to withdraw.[14]  The court granted the motion.  Attorney Kevin J. Reddington formally entered his appearance on January 28, 2014, and, that same day, the district court rescheduled the trial for July of that year.

After the grand jury returned the second superseding indictment in April, three additional attorneys — Albert S. Watkins, Michael D. Schwade, and Anthony S. Bretz — each entered an appearance on Zimny's behalf.  Zimny moved for another continuance in late June 2014.  Although this continuance motion listed other cases that Reddington and Zimny's other counsel had been working on, it made no mention of any upcoming murder trial in Massachusetts Superior Court.  In response to the continuance motion, the district court rescheduled Zimny's trial for March 2,

---

[14] In addition to the attorney moving to withdraw, Zimny was also represented at this point by Attorney Richard J. Annen.

2015.[15]  In November 2014, the government filed its own continuance motion.  The district court granted this motion as well, rescheduling Zimny's trial for March 23.

On February 19, Zimny moved for another continuance. Zimny offered several reasons for his request, including the government's failure to provide all discovery in a timely manner, the inability of Zimny's tax expert to complete his forensic-accounting examination based on the incomplete discovery provided by the government, and the tax expert's unavailability for in-court testimony until April 30.  After explaining these reasons, Zimny's motion offered a fourth reason for delay:  Reddington was scheduled to start a two-week murder trial (the Baptiste trial) in Massachusetts Superior Court on February 23, leaving him unable to review the necessary discovery until shortly before Zimny's March 23 trial date.  The argument section of the motion, however, focused exclusively on the unavailability of the tax expert.  The district court denied Zimny's continuance motion in a short order.

About two weeks later, Zimny filed a document that was captioned, "MOTION TO CONTINUE TRIAL."  Despite its caption, the filing did not request the court to postpone Zimny's trial date. Instead, Reddington sought to "present[] the following information to th[e c]ourt and counsel immediately for advice or ruling on a

_____

[15] From here on out, all specified dates are from the year 2015 unless otherwise noted.

- 23 -

continuance that may be imminent" and to provide "immediate notification to the Court" regarding developments in the Baptiste trial, which Reddington now estimated would be "a week-long trial, not including deliberations."

Reddington reported that, when he appeared for the Baptiste trial on February 23, the prosecution moved for a continuance because it was having difficulty securing the attendance of a crucial witness. The trial judge granted a one-day continuance. The prosecution was still unable to obtain the witness's presence the following day, so the judge continued the Baptiste trial until March 2. On that date, the prosecution successfully moved for a third continuance until March 16. Reddington alerted the Massachusetts trial judge to the potential conflict with Zimny's trial date, but the Baptiste trial judge held firm.

After the government opposed Zimny's filing, Zimny filed a reply in which he stated that "the only reason for the [filing] was a courtesy notice to th[e c]ourt and the government of a potential problem in scheduling" and that "[c]ounsel is well aware of th[e c]ourt's order [scheduling Zimny's trial for March 23] and in no way is seeking to contravene it." The district court denied Zimny's motion.

On March 17, Zimny filed a "STATUS REPORT" that presented "information [about the Baptiste trial] as a courtesy update":

The Baptiste jury was empanelled, as scheduled, on March 16. Zimny further reported that the prosecution "estimate[d] that the case will get to the jury no earlier than . . . March 25." This filing did not request a continuance of Zimny's trial date.

The following day, Zimny filed a continuance motion. The continuance motion invoked Zimny's Sixth Amendment right to counsel of choice and argued that a continuance was necessary so that Reddington — who the motion characterized as Zimny's "lead counsel and sole local counsel" and essential "within the context of all aspects of the undertakings by [Zimny's] team of defense counsel, jury selection, opening statements, and the examination of witnesses" — could prepare for and participate in Zimny's trial.

The district court denied the continuance motion the same day for reasons we'll soon discuss in detail. Zimny's trial began as scheduled five days later. Watkins functioned as Zimny's lead counsel for the first several days of trial: He handled jury selection, delivered the opening statement, and cross-examined Gerald Chow (Gerald), a key government witness, and another witness.

The next day, Juror No. 8 did not report for jury service. In the course of excusing the jurors for the day, the district court explained that the attorneys would spend the day polishing their evidentiary presentations; in the course of this explanation, the court stated that, because it had denied the

attorneys' request to postpone the trial, "they are not quite as prepared as they otherwise would be." The following day, Watkins requested that the district court clarify for the jurors that Zimny had not requested a continuance because his attorneys were not prepared, but had requested one because of Reddington's involvement in the Baptiste trial. The district court responded, "I think I was referring to the exhibits," but the court nonetheless told the jurors that it had not intended to suggest that counsel were unprepared and that its comments from the day before were aimed at nudging counsel on both sides "to make sure that they went over the exhibits and worked out a mechanism that would move this along a little bit better."

Reddington returned from the Baptiste trial on the sixth day of Zimny's trial (counting two days — the first and the fourth — on which no evidence was presented). The district court again sent the jurors home that day without hearing any evidence because of juror-attendance issues. Reddington was present in court for the remainder of trial, and he questioned only four of the seventeen witnesses who testified after his return. Watkins continued to function as lead counsel, questioning twelve more witnesses after Reddington's return and delivering closing argument.[16]

---

[16] Annen also questioned one witness.

On appeal, Zimny argues that the district court's denial of his continuance motion deprived him of his Sixth Amendment right to counsel of choice.

## 2. Our Take

We start with the principles. The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [or her] defence." U.S. Const. amend. VI. "[A]n element of this right" is the right to counsel of choice — "the right of a defendant who does not require appointed counsel to choose who will represent him [or her]." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). And the erroneous deprivation of the right to counsel of choice is a structural error not subject to harmless-error analysis. Id. at 150, 152; see also United States v. Robinson, 753 F.3d 31, 39 (1st Cir. 2014).

The right to counsel of choice, however, is not absolute. United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013). Instead, the right "is circumscribed in several important respects." Gonzalez-Lopez, 548 U.S. at 144 (quoting Wheat v. United States, 486 U.S. 153, 159 (1988)). The Supreme Court has recognized, for example, "a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." Id. at 152

(internal citation omitted); see also Morris v. Slappy, 461 U.S. 1, 11-12 (1983). Consequently, district courts "have 'broad discretion' to control their calendars by granting or denying continuance motions," and "'only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.'" Maldonado, 708 F.3d at 42 (quoting Morris, 461 U.S. at 11-12).

### a. Threshold Disputes

Right off the bat, the parties spar over two threshold issues — our standard of review and whether Zimny must show that he was prejudiced by the denial of his continuance motion to establish a deprivation of his right to counsel of choice. We address each in turn.

The standard-of-review dispute is easily resolved. Zimny, on the one hand, asserts that we review de novo the issue of whether the district court deprived him of his Sixth Amendment right to counsel of choice because the issue presents a mixed question of fact and law. But, as the government is quick to point out, our case law makes clear that we review the denial of a continuance motion — even where the motion may impact a defendant's choice of counsel — for abuse of discretion. Maldonado, 708 F.3d at 42. This makes sense: After all, courts have "'broad discretion,'" as we and our judicial superiors have said, when

- 28 -

ruling on such motions.  Id. at 42 (quoting Morris, 461 U.S. at 11); see also id. ("It surely goes without saying — but we say it anyway — that our review is for abuse of discretion.").[17]

The dispute about the need to show prejudice in this context is more vexing.  Citing our continuance-denial case law, the government asserts that it is "essential" for Zimny to show that he suffered actual prejudice as a result of the denial of his continuance motion.  Zimny, by contrast, maintains that where, as here, the right to counsel of choice is at stake, requiring a defendant to show that he or she was prejudiced by the denial of a continuance motion is incompatible with Gonzalez-Lopez, where the Court highlighted, in the course of holding that the erroneous deprivation of this right is a structural error, the difficulties of showing prejudice in this context.  See 548 U.S. at 150-51.  At oral argument, the government shot back that the Court in Gonzalez-Lopez took pains to emphasize that it was confronted with an established erroneous deprivation of the right to counsel of choice

---

[17] We note that we are not the only circuit that, post-Gonzalez-Lopez, reviews the denial of a continuance motion for abuse of discretion even where the denial of the motion potentially implicates a defendant's right to counsel of choice.  See United States v. Jones, 733 F.3d 574, 587 (5th Cir. 2013) (rejecting argument for application of de novo review because Gonzalez-Lopez's reference to trial court's discretion "is inconsistent with de novo review"); see, e.g., United States v. Sinclair, 770 F.3d 1148, 1150, 1154 (7th Cir. 2014); United States v. Griffiths, 750 F.3d 237, 241-42 (2d Cir. 2014); United States v. Flanders, 491 F.3d 1197, 1216 (10th Cir. 2007); United States v. Whitehead, 487 F.3d 1068, 1071 (8th Cir. 2007).

and was not faced with the question of a district court's power to make scheduling and other case-management decisions that may impact that right. See id. at 151-52. Even so, Zimny parries, Gonzalez-Lopez teaches that requiring him to demonstrate prejudice from the continuance denial in order to establish an erroneous deprivation of his right to counsel of choice imposes an obligation to "prove what cannot be proven."

The parties' disagreement need not occupy us for long. Certainly, a court, in deciding whether to grant a continuance, should consider whether and how a lack of continuance may or may not impair defense efforts. See United States v. Ottens, 74 F.3d 357, 359-60 (1st Cir. 1996). At the same time, one struggles to see how a defendant could be required to show that the result of the trial likely would have differed had a court not abused its discretion by denying a continuance needed to allow participation by counsel of choice. See Gonzalez-Lopez, 548 U.S. at 150-51. We therefore assume, without deciding, that Zimny need only establish that the denial of his continuance motion erroneously deprived him of his right to counsel of choice by showing that the denial amounts to "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Maldonado, 708 F.3d at 42 (quoting Morris, 461 U.S. at 11-12). Zimny has not made this showing (though not for lack of effort), as we'll now explain.

### b.    The Merits

Zimny characterizes the district court's denial of his continuance motion as "arbitrar[y]" and complains that "[t]he court gave no good reason for" denying the motions.  He attacks the denial every which way, challenging several of the factors identified by the district court in denying the motion and sprinkling in, just for good measure, a charge that the court's consideration of the motion was "fundamentally flawed."  Once again, we tackle Zimny's several arguments one at a time.  Spoiler alert: After careful consideration, we cannot label the district court's denial of Zimny's continuance motion "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."  Maldonado, 708 F.3d at 42 (quoting Morris, 461 U.S. at 11-12).

### (i)

Just before trial, when Watkins asserted that the conflict with the Baptiste trial was "something that was out of [Reddington's] control," the district court disagreed:  "I'm not sure that is absolutely correct.  Nobody suggested that the state judge should call me or I should call the state judge or that we work out a schedule.  It simply happened."  Zimny thinks this justification was suspect.  We disagree.

Rule 40.2 of the Local Rules of the United States District Court for the District of Massachusetts, which is entitled

"Conflict of Court Appearances," imposes clear requirements on attorneys in Reddington's predicament who have a scheduling conflict arising from multiple cases. Subsection (d) sets forth a "scheduling policy" for situations where "counsel have engagement conflicts with respect to cases pending in the Massachusetts Superior Court and th[e district] court."[18] LR, D. Mass. 40.2(d). The rule also places the obligation on counsel to alert the district-court judge and the Massachusetts Superior Court judge of the conflict and the scheduling policy set forth in the rule:

> Counsel shall notify the presiding Superior Court Justice and the judicial officer [of the district

---

[18] In particular, the rule sets forth the following scheduling policy:

    (1)  Trials shall take precedence over all other hearings.

    (2)  Jury trials shall take precedence over nonjury trials.

    (3)  Criminal cases shall take precedence over civil cases.

    (4)  Criminal cases involving defendants who are in custody pending trial shall take precedence over other criminal cases.

    (5)  Among civil cases, or among criminal cases not involving defendants in custody, the case having the earliest docket number shall take precedence over the others, except that a trial setting involving numerous parties and counsel will ordinarily take precedence over other trials.

LR, D. Mass. 40.2(d).

- 32 -

court[19]] of the scheduling conflict, in writing, not later than 7 days after the receipt of the scheduling order giving rise to the conflict. Counsel's notification <u>shall include</u> (1) the names and docket numbers of each case, (2) the date and time of the scheduled proceedings in each case, and (3) <u>a brief statement as to which case has precedence under this policy</u>.

<u>Id.</u> (emphases added). Once counsel provides this required written notice, the rule directs that "[t]he case or cases not having precedence shall be rescheduled, unless the presiding Superior Court justice and judicial officer [of the district court] agree otherwise."[20] <u>Id.</u>

In this case, although several of Zimny's filings that preceded the March 18 continuance motion notified the district court of the impending conflict, none of those filings contained the requisite "brief statement as to which case has precedence under th[e] policy" of Local Rule 40.2(d). Indeed, none of the

---

[19] The phrase "judicial officer" in the local rules "refers to either a United States District Judge or a United States Magistrate Judge." LR, D. Mass. 81.2.

[20] We note that the District of Massachusetts appears to be the only district in this circuit with a rule that both (1) places an obligation on counsel to notify the court of a scheduling conflict and (2) sets a scheduling policy for resolving the conflict. The District of Rhode Island has a local rule that imposes a notification obligation on an attorney who has a conflict, <u>see</u> DRI LR Gen 207(a), but that rule does not set a scheduling priority. The other districts within this circuit appear not to have any local rule on this subject. We commend the District of Massachusetts for promulgating Local Rule 40.2(d); attorney compliance with it can help eliminate potential counsel-of-choice dilemmas from materializing.

- 33 -

filings even cited this important rule. The same is true of Zimny's March 18 continuance motion. Reddington did not seek to invoke Local Rule 40.2(d), which clearly has been adopted to reasonably resolve scheduling conflicts.

The record also amply supports the district court's assessment that Reddington was slow to seek involvement from the district court. To be sure, Reddington first flagged the Baptiste trial as a potential conflict back on February 19 — over a month before Zimny's scheduled March 23 trial date. At that point, the Baptiste trial was scheduled to begin on February 23. But the Baptiste trial's start date was delayed several times — first by one day (to February 24), then by six additional days (to March 2), and then by two more weeks (to March 16). Reddington never even informed the district court of the continuances in the Baptiste trial until March 4 — nine days after he first learned of the delay-causing witness-attendance issue.

The decisions not to invoke Local Rule 40.2(d) or more promptly update the district court fit hand-in-glove with the fact that Zimny's filings up until the last minute did not actually seek a continuance, even when Reddington first learned that the trials would likely conflict. Instead, Zimny's March 4 filing merely provided information to the court "for advice or ruling on a continuance that may be imminent." In fact, Reddington himself confirmed the limited nature of the March 4 filing in Zimny's reply

to the government's opposition to that filing.  In the reply, Reddington clarified that "the only reason for the [March 4 filing] was a courtesy notice to th[e court] and the government of a potential problem in scheduling" and that he "in no way [was] seeking to contravene" the court's prior order setting a March 23 trial date.  We are hard-pressed to fault the district court for its negative response to the March 4 filing.  If Zimny was seeking a continuance or other relief from the district court, he should have done so in clear, unmistakable terms.  Instead, he did not make a clear request for a continuance until March 18 — two full weeks after the March 4 filing and a mere five days before Zimny's trial date.

In these circumstances, it was not unreasonable for the district court to find that Zimny delayed in requesting the court's assistance in navigating the conflict with the Baptiste trial. See United States v. Francisco, 642 F. App'x 40, 43 (2d Cir. 2016) (affirming district court's denial of continuance motion where denial was based, in part, on "defense counsel's failure to bring the conflict to the court's attention in a timely manner"); cf. United States v. Flecha-Maldonado, 373 F.3d 170, 175-76 (1st Cir. 2004) (affirming district court's order that denied continuance motion based on retained counsel's scheduling conflict and imposed a 5 p.m.-to-9 p.m. trial schedule and rejecting counsel's argument on appeal that "he assumed the two judges would ascertain there

was a scheduling conflict and work it out" because "the obligation was on counsel to resolve this conflict"); United States v. Orlando-Figueroa, 229 F.3d 33, 40 (1st Cir. 2000) (noting, in affirming district court's denial of continuance motion, that "[a]lthough the bulk of the complained-about [discovery] materials [that caused the request for a continuance] were provided to the defendants on January 13, it was not until six days later, on January 19, that the defendants filed their first motion for a continuance[;] [t]here is no explanation in the briefs for this delay").

**(ii)**

The court also stressed that there were several members of the defense team, that "several, if not all, of the specially admitted counsel have personally participated in one or more hearings or conferences in the course of these proceedings," and that Watkins in particular "is known to be experienced, able and clearly familiar with this case." Zimny offers what we perceive to be two distinct arguments — one legal and one factual — that this aspect of the district court's denial was erroneous. First, on the legal front, he argues that it was improper for the district court to "replace Zimny's chosen trial counsel with its own selection." Second, Zimny argues as a matter of fact that the district court's conclusion that Watkins was prepared to serve as lead counsel was improper because it was not based on any inquiry

of Watkins and that the record actually shows that Watkins was not adequately prepared to cross-examine Gerald. We reject both arguments.

It was not an abuse of discretion for the district court to place some weight on the fact that Zimny had other counsel ready to fill the void left by Reddington's scheduling conflict. The Gonzalez-Lopez Court recognized "a court's power," in some circumstances, "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." 548 U.S. at 152; see also id. at 155 (Alito, J., dissenting) ("If a trial judge schedules a trial to begin on a particular date and defendant's counsel of choice is already committed for other trial until some time thereafter, the trial judge has discretion under appropriate circumstances to refuse to postpone the trial date and thereby, in effect, to force the defendant to forgo counsel of choice."); Morris, 461 U.S. at 11-12. And where "the counsel who becomes unavailable for trial has associates adequately prepared to try the case," that circumstance can be considered. United States v. Bowe, 221 F.3d 1183, 1190 (11th Cir. 2000); id. at 1188, 1190 (affirming denial of continuance motion based on counsel's unavailability due to entry into drug rehabilitation program where district court reasoned that "'[d]efendant has retained several able lawyers'").

Zimny's factual argument fares no better. For starters, we can't fault the court's on-the-ground assessment of Watkins's ability to handle the bulk of the trial responsibilities. The court had seen Watkins in action at pretrial hearings and conferences, consulted his website biography, and concluded that he was "experienced, able and clearly familiar with this case."

And, notwithstanding Zimny's assertions to the contrary, the record does not belie the court's conclusion. Although Watkins asked for the court's patience before he cross-examined Gerald, he also added, "I am prepared as best I can be . . . . I think we've got it all in order and I think we've got it in shape." Similarly, although the court told the jurors that the attorneys were able to use the delay caused by a juror's absence to improve their evidentiary presentations, it later clarified that this comment was concerned solely with the handling of exhibits and was not intended as an assessment of counsel's general lack of preparedness. Finally, we note that, even when Reddington returned from the Baptiste trial, Watkins continued to act as Zimny's lead counsel.

Discerning no abuse of discretion in the court's reliance on this factor, we march on.

### (iii)

The district court also noted that the trial date had been set for four-and-a-half months. Zimny asserts that this

factor was irrelevant because the conflict "only arose and developed in the month leading up to the trial" and "could not have been anticipated when the date was set in November 2014." We disagree. It was not unreasonable for the district court to consider the long-standing trial date, especially where, as here, the continuance request was made shortly before that scheduled trial date. See United States v. Konstantin, 280 F. App'x 54, 55 (2d Cir. 2008) (explaining, in affirming denial of continuance motion based on scheduling conflict of new counsel of choice, that "[t]he defendant asked for the adjournment one week prior to trial, despite the fact that the trial date had been set for eight months; it was well within [the district court's] discretion to deny his request."); cf. United States v. Myers, 294 F.3d 203, 207 (1st Cir. 2002) (emphasizing, in affirming district court's denial of motion for substitution of appointed counsel, that "motion came late in the day: it was filed months after the conflict developed, and a mere five days before the scheduled sentencing[;] [n]or did the appellant ever explain his failure to register a complaint earlier in the proceedings").

**(iv)**

The district court also observed that it had granted Zimny's multiple prior continuance requests. Zimny protests that these continuances "were granted for legitimate reasons that, as the record shows, were made necessary by circumstances beyond

Zimny's control."  But a district court has discretion to weigh prior considerations in the calculus of whether to grant an additional continuance.  See Maldonado, 708 F.3d at 43.  And, even if the prior continuances did not militate strongly in favor of denying the continuance motion, there were several other factors — including the court's supportable assessment that Reddington failed to request assistance from the court in a timely and effective manner as provided in Local Rule 40.2(d) — that supported the denial of the motion.  Cf. United States v. Flanders, 491 F.3d 1197, 1216 (10th Cir. 2007) (noting, in case where district court relied on prior continuances in denying final continuance motion, that, "[a]lthough we question whether the district court could entirely fault [d]efendant for the numerous delays in bringing this case to trial, that was not the only reason provided").

**(v)**

The district court also noted that the case was "more than two years old."  Zimny argues that the age of the case "had no bearing on the circumstances that prompted Zimny's request for a continuance."  But case law supports the district court's assessment of the age of the case as a relevant consideration. See, e.g., Flanders, 491 F.3d at 1216; see also United States v. Pineda Pineda, 481 F. App'x 211, 212 (5th Cir. 2012) (per curiam) (affirming district court's denial of continuance motion where court based denial, in part, on its assessment that "the case had

been going on for 'a very long time' already").  So we see no abuse of discretion in the court's decision to add this factor to the mix.[21]

**(vi)**

Apart from his efforts to undermine the factors that the district court identified, Zimny also paints the district court's consideration of the continuance motion as "fundamentally flawed." In particular, Zimny insists that the district court "fail[ed] to acknowledge that Zimny's Sixth Amendment right to be represented by counsel was at stake"; "fail[ed] to implement the Wheat[22]

---

[21] Zimny also notes that the court did not deny the continuance motion based on the court's own cluttered docket and that the government did not argue that it would have been prejudiced if the continuance motions were granted.  True enough, but the fact that the district court did not invoke these factors does not make its denial of the continuance motion an abuse of discretion because the factors that the court did consider show that the court's denial was neither unreasoning nor arbitrary.  Additionally, because we reject Zimny's arguments that the district court erred in considering each of the factors it did, we necessarily find no merit in Zimny's assertion that "[t]he court's reliance on these factors suggests that it considered any delay to be unacceptable."

[22] In Wheat, 486 U.S. at 155, 163-64, the Court decided that, although "[t]he [d]istrict [c]ourt must recognize a presumption in favor of petitioner's counsel of choice, . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict."  Id. at 164. The Court added that "[t]he evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court."  Id.

- 41 -

presumption"; and "fail[ed] to exercise its judgment within the limitations of the Sixth Amendment."[23]

To the extent that Zimny intends this argument to suggest that the district court abused its discretion because it did not explicitly acknowledge his Sixth Amendment right to counsel of choice, we are unpersuaded. Zimny's March 18 continuance motion clearly invoked his Sixth Amendment right to counsel of choice. In these circumstances, we will not presume that the district court wholly disregarded this well-established constitutional right. The record does not indicate that the district court was operating under a mistaken assumption about the nature of Zimny's right to counsel of choice. Cf. United States v. Smith, 618 F.3d 657, 666 (7th Cir. 2010) (concluding that "there [was] some question whether the district court correctly understood the scope of [the defendant's] right to counsel of his choice" where, "after [defense counsel] argued that '[the defendant] has a constitutional right to choice of counsel,' the court replied, 'No, he does not. He had a constitutional right to counsel. He doesn't have a

---

[23] In the course of making this argument, Zimny notes that the district court "pointedly referred to Reddington merely as 'local counsel.'" But Reddington referred to himself as "local counsel" in his court filings of March 4, March 5, and March 17. And Zimny's March 18 continuance motion referred to Reddington as Zimny's "lead counsel and sole local counsel" and "sole local lead counsel." So we do not view the district court's reference to Reddington in the same manner that he referred to himself as betraying a misunderstanding of Zimny's Sixth Amendment right to counsel of choice.

constitutional right to pick any person he wanted.'").  Instead, the district court offered several reasons that, in its view, warranted the denial of the continuance, and this decision was neither unreasoning nor arbitrary.

* * *

Make no mistake:  The Sixth Amendment right to counsel of choice is important.  Maldonado, 708 F.3d at 42.  "But as important as that right is, it is not absolute."  Id.  Where, as here, a claimed violation of that right is based on the district court's denial of a continuance motion, precedent compels us to ask not whether we too would deny the motion if we were sitting as trial judges but instead whether the denial qualifies as "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."  Id. (quoting Morris, 461 U.S. at 11-12).

Because the district court in this case identified several factors that supported its denial — including Zimny's failure to seek a continuance until two weeks after the alleged need arose — we cannot say that it was unreasoning or arbitrary. Cf. Abby v. Howe, 742 F.3d 221, 227 (6th Cir. 2014) (concluding that habeas relief was not warranted where trial court denied continuance motion based on scheduling conflict of one of defendant's two attorneys; trial court noted "(1) the longstanding trial date, which already had been reset several times; (2) its

late notice of the problem; (3) [conflicted counsel's] failure to alert the court of the conflict or attempt to reschedule either of his cases; (4) the fact that both [remaining counsel] and [conflicted counsel] previously had appeared alone in [defendant's] case without objection or incident; and (5) the fact that [remaining counsel] was an experienced attorney who was prepared to proceed with or without [conflicted counsel]"). Therefore, we must reject Zimny's argument that the district court erroneously deprived him of his counsel of choice. So we trek to Zimny's final appellate argument.

### C.   Joinder of Charges and Severance

#### 1.   Setting the Stage

The second superseding indictment contained thirteen counts:  counts 1 through 5 charged Zimny with wire fraud; counts 6 through 10 charged Zimny with engaging in unlawful monetary transactions; counts 11 and 12 charged Zimny with filing false tax returns; and counts 13 and 14 charged Zimny with bank fraud. Zimny filed a motion to sever the bank-fraud counts from the remaining counts, arguing both that the bank-fraud counts were improperly joined under Rule 8(a) of the Federal Rules of Criminal Procedure and that they should be severed under Rule 14 of the Federal Rules of Criminal Procedure.[24]  The district court denied the motion.

---

[24] The motion actually sought to sever the bank-fraud counts as well as the unlawful-monetary-transactions and false-tax-return

- 44 -

At trial, the government produced evidence that Zimny submitted loan applications that both overstated his assets and failed to disclose all of his debts and that, in connection with these applications, he submitted forged documents to multiple lending institutions. Zimny also sent these lenders forged tax returns indicating that Zimny's income was substantially higher than the amount he reported to the IRS.

The jury ultimately convicted Zimny on counts 1 through 13 and acquitted him of count 14, the second of the two bank-fraud counts. On appeal, Zimny argues that the bank-fraud counts were improperly joined and that the district court erred in denying his motion to sever those counts.

## 2.   Our Take

We review de novo Zimny's claim that the bank-fraud counts were improperly joined under Rule 8, and we assess the district court's denial of Zimny's severance motion under an abuse-of-discretion standard. See United States v. Ponzo, 853 F.3d 558, 568 (1st Cir. 2017); United States v. Melendez, 301 F.3d 27, 35 (1st Cir. 2002).

The parties squabble over whether the bank-fraud charges were improperly joined. But even if Zimny prevailed in this

---

counts. On appeal, however, "Zimny does not challenge the joinder of counts 1 through 12," and instead challenges only the joinder of the bank-fraud counts (counts 13 and 14).

battle, he'd still lose the war, for "a misjoinder is not reversible if it was harmless," United States v. Edgar, 82 F.3d 499, 503 (1st Cir. 1996), and a misjoinder was harmless if "[i]t did not result in 'actual prejudice,'" id. at 504 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).  Actual prejudice in this context means "the substantial and injurious effect or influence in determining the jury's verdict."  Ponzo, 853 F.3d at 568.

Two features of this case convince us that Zimny did not suffer actual prejudice from the joinder of the bank-fraud counts: the court's instruction to the jurors to consider each count separately, and the jury's not-guilty verdict on count 14, one of the bank-fraud counts.  Thus, even assuming (without deciding) that misjoinder occurred, Zimny is still not entitled to a new trial because the error (if any) was harmless.  See id. (taking this same approach); Edgar, 82 F.3d at 504 (same).  We explain briefly.

In its final charge, the district court told the jurors to "consider the evidence separately as to each of these counts and decide each separately based on the evidence as to that count." "And 'the case for prejudice is especially weak' when a court does precisely that."  Ponzo, 853 F.3d at 568 (quoting United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995).

Hold on, Zimny says: The district court also told the jurors that the offenses were related, and, in Zimny's view, this perceived misstep either entirely "negate[d] the minimal limiting instruction the court gave a few minutes later" or, at the very least, "likely confused the jury." And, as Zimny sees things, this confusion was compounded by the government's opening statement and closing argument, both of which also emphasized the relatedness of the charges. We are unpersuaded.

For starters, this juror-confusion argument is substantially undermined by Zimny's failure to object to the now-complained-of passage of the final charge, despite being given a clear opportunity to voice any objections at the conclusion of the charge.[25] Moreover, we disagree with Zimny's assessment of the likelihood of juror confusion. The district court's statement about the relatedness of the offenses was simply an introductory remark to the court's brief outline of the indictment.[26] This comment stands in stark contrast to the clear directive that the

_____

[25] Nor, for that matter, did Zimny raise any concern with this statement when the district court previewed its instructions in a charge conference, despite being given the opportunity to voice any objections. Zimny similarly failed to lodge any objection to the prosecutor's opening statement or closing argument.

[26] We note, in passing, that the district court's statement that the offenses were related has some basis in the evidence; Zimny's purchase of a particular piece of property was facilitated by a bank loan (charged in count 13), as well as a down payment (charged in count 10) comprised of funds he received from the Chows (charged in count 5).

court gave the jury to consider the evidence separately as to each count. And "[w]e of course presume that jurors obey a court's instructions." Id. at 584.

In any event, we need not speculate about whether the jurors followed the court's instruction in this case; they demonstrated their ability to "discriminat[e] among the evidence applicable to each count" when they acquitted Zimny on count 14. Id. at 569 (alteration in original) (quoting Edgar, 82 F.3d at 504). And such an acquittal "helps undercut an actual-prejudice claim." Id.[27]

Finally, Zimny argues that he was prejudiced by the "huge volume of damaging bank fraud evidence that was irrelevant to the Chow charges." This argument cannot carry the day. The combo of the court's instruction and the jury's not-guilty verdict on one of the bank-fraud counts takes much, if not all, of the wind from the sails of this argument. Moreover, some of the bank-fraud

---

[27] Zimny appears to attempt to distinguish this case from Edgar by observing that, in this case, "[n]o contemporaneous limiting instruction was given when [the bank-fraud] evidence was admitted." We are puzzled by this apparent attempt at distinguishing Edgar because the only limiting instruction given in that case, so far as the opinion lets on, was at the close of evidence after the court acquitted the defendant of the potentially improperly joined count; the court told the jurors to disregard the counts subject to the acquittal and the evidence offered in support of them. 82 F.3d at 504 & n.6. In any event, as far as we can tell, Zimny never requested a cautionary instruction when the bank-fraud evidence was admitted, and, for his part, he hasn't pointed us to any place in the record where such a request was made.

evidence consisting of the forged tax returns and the statements Zimny made on loan applications about his income would still have been relevant and admissible to the counts that charged Zimny with filing false tax returns — the joinder of which Zimny does not challenge on appeal.  See United States v. Griffin, 524 F.3d 71, 74-75 (1st Cir. 2008) (recounting evidence in false-tax-return prosecution, including tax returns submitted to the IRS that reported deflated income levels and evidence that defendant "set up bank accounts in order to store her [unreported] proceeds").  And where, as here, some of the evidence relating to the counts that were improperly joined is admissible as to the other counts, that circumstance also undercuts an assertion of prejudice.  See Edgar, 82 F.3d at 504.  Finally, the government's independent evidence on "the Chow charges" was quite strong.  See id. at 505 (noting, in finding no prejudice from assumed improper joinder, that "there was substantial independent evidence on the counts of conviction").

In the end, Zimny is left with nothing more than his argument that the government's decision to present "a general course of fraudulent conduct by Zimny[] creat[ed] an unacceptable likelihood that his conviction on the other counts [was] influenced by propensity evidence and arguments."  But such "[g]arden-variety arguments of spillover . . . without more, are insufficient to require severance."  Id.

For these reasons, we conclude that, even assuming that the bank-fraud counts were improperly joined, any misjoinder was harmless and therefore does not amount to reversible error.

**THE END**

We now wrap up this trilogy of appeals by affirming Zimny's conviction.