# United States Court of Appeals
## For the First Circuit

No. 17-1924

UNITED STATES OF AMERICA,

Appellee,

v.

SALLY LÓPEZ MARTÍNEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Barron and Selya, Circuit Judges,
and Katzmann, Judge.[*]

Linda Backiel for appellant.
Thomas F. Klumper, Assistant United States Attorney, Senior
Appellate Counsel, with whom W. Stephen Muldrow, United States
Attorney, and Mariana E. Bauzá-Almonte, Assistant United States
Attorney, Chief, Appellate Division, were on brief, for appellee.

---

[*] Of the United States Court of International Trade, sitting
by designation.

April 7, 2021

**BARRON, Circuit Judge**.  Sally López Martínez ("López") and nine others were indicted in 2015 in the District of Puerto Rico on various charges relating to public corruption in the Commonwealth.  The twenty-five-count indictment included six counts that charged López with various federal offenses pertaining to her actions as an official in the executive branch of the government of Puerto Rico.  López ultimately was tried jointly on those six counts with three other individuals who also were charged in the indictment, one of whom was charged in some of the same counts as López as well as in separate counts and two of whom were charged only in separate counts.  López was convicted of all six counts that she faced.  She now argues that her convictions were not supported by sufficient evidence.  She also challenges them on a variety of other grounds, including several relating to the fact that she was tried jointly.  We conclude that the evidence in the record does suffice to support her convictions, but we agree with her contention that the District Court's refusal to sever her trial from that of one of her codefendants was an abuse of discretion.  In consequence, we hold that each of her convictions must be vacated.

## I.

The following facts are not in dispute.  In January of 2013, López was nominated by the then-Governor of Puerto Rico, Alejandro García Padilla ("García"), to the position of

administrator of the Puerto Rico Workforce Development Administration ("ADL"). She held the position of interim administrator at ADL until she was confirmed for the permanent post in June 2013.

During López's tenure as the interim administrator and then as the administrator, ADL held job fairs to bring together unemployed or soon-to-be-unemployed workers and prospective employers. López's responsibilities at the helm of ADL included coordinating the job fairs.

Government contractors carried out much of the work involved in holding the fairs. During López's time running the agency, ADL awarded contracts relating to the fairs to entities affiliated with Anaudi Hernández Pérez ("Hernández"). Hernández had been a fundraiser for García's gubernatorial campaign and had helped bring about López's nomination to be the administrator of ADL. He also provided various gifts to López while she was running ADL and while that agency was awarding contracts to entities that were affiliated with him. During roughly the same time period, both the Puerto Rico Aqueduct and Sewer Authority ("AAA")[1] and the Puerto Rico House of Representatives awarded contracts to entities affiliated with Hernández.

---

[1] AAA is the Spanish-language acronym for the Aqueduct and Sewer Authority, which is occasionally referred to by its English-language acronym, PRASA, in the record.

In November 2014, the Federal Bureau of Investigation raided the offices of 3 Comm Global, which was an entity affiliated with Hernández. Thereafter, on December 2, 2015, López, Hernández, and a number of others were charged in a twenty-five-count indictment in the District of Puerto Rico.

The indictment included charges on various federal offenses relating to public corruption involving the awarding of contracts to entities affiliated with Hernández by ADL, AAA, and the Puerto Rico House of Representatives. López was charged in six of the indictment's counts. Hernández was charged in sixteen of them. The six counts that charged López were for: (1) conspiracy in violation of 18 U.S.C. § 371 to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 or federal programs bribery in violation of 18 U.S.C. § 666 (Count One); (2) conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349 (Count Two); (3) honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 (Counts Three, Four, and Five); and (4) receipt of a bribe by an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (Count Eleven).

The indictment charged eight individuals in addition to López and Hernández. Two were business partners of Hernández -- Javier Muñiz Alvarez ("Muñiz"), a de facto part-owner of JM Professional & Training Group, Inc. ("JMP"); and Carlos Luna Cruz,

- 5 -

who was the face of JMP and signed all of the firm's contracts. Three were employees of the Puerto Rico House of Representatives -- Xavier González Calderón ("González"), the Administrator for the House; Víctor Burgos Cotto ("Burgos"), the Director of Technology; and Glenn Rivera Pizarro ("Rivera"), Special Assistant for Administration. Two more worked for AAA -- Ivonne Falcón Nieves ("Ivonne Falcón") was AAA's Vice President and Sonia Barreto Colón ("Barreto") was the agency's Purchasing Director. The last of the eight others named in the indictment was Marielis Falcón Nieves ("Marielis Falcón"), Ivonne Falcón's sister, who was not a public official.

In February of 2016, Muñiz filed a motion under Rule 14[2] and Rule 8(b)[3] of the Federal Rules of Criminal Procedure. He contended under Rule 8(b) that the counts that he faced had been improperly joined with those of others charged in the indictment, though he did not contend that the counts that charged López were improperly joined with his counts. He also contended under Rule

---

[2] Rule 14(a) provides: "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

[3] Rule 8(b) provides: "The indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count."

that his trial should be severed from that of his codefendants, including López.

López moved to join Muñiz's motion, though seemingly only with respect to his claim of error concerning improper joinder pursuant to Rule 8(b). The District Court ultimately permitted her to do so. It also permitted Barreto, Marielis Falcón, and Rivera to join Muñiz's motion.

While Muñiz's motion was pending, Hernández pleaded guilty on February 18, 2016, to all the charges against him except for those set forth in Counts Sixteen (which alleged extortion in violation of 18 U.S.C. § 1951) and Eighteen (which alleged money laundering in violation of 18 U.S.C. § 1956(h)). Hernández was not tried, however, on either of those counts.

Then, on April 21, 2016, the District Court denied the pending motion by Muñiz across the board. The District Court concluded that there was no improper joinder under Rule 8(b), because, taking the allegations in the indictment to be true, "the acts charged [were] part of an over-arching conspiracy" common to all the counts, the purpose of which "was for the defendants to utilize the public officials in positions within the government of Puerto Rico to benefit and enrich themselves through bribery." The District Court also rejected the request for severance under Rule 14 because it "d[id] not clear the high hurdle set in the

caselaw," and noted that any risk of spillover prejudice from conducting a single trial could be cured by jury instructions.

Over the next few months, five of the remaining codefendants pleaded guilty. That left only López, the Falcón sisters, and Rivera to be tried together.

Following the denial of the severance motion that Muñiz had first filed, López and the three other remaining defendants repeatedly moved for separate trials, including even after their joint trial had begun. These motions, too, were denied. After twenty-nine days of trial, each of these four codefendants -- including López -- was found guilty on all the charges that he or she faced.

Judgment entered against López on August 31, 2017. She filed a timely notice of appeal on September 13, 2017. See Fed. R. App. P. 4(b)(1)(A).

## II.

One of the grounds on which López challenges her convictions is that they were based on insufficient evidence.[4] We begin our analysis of her challenges to her convictions on that

---

[4] In addition to these sufficiency challenges and the severance and misjoinder challenges we address below, López also brings challenges to the jury instructions, to various evidentiary rulings by the District Court, and to her sentence. Because we ultimately conclude that she prevails on her severance claim with respect to Rivera, and that we consequently must remand for a new trial on all of her convictions, we do not reach these other arguments.

- 8 -

ground, because, insofar as the sufficiency challenges that she brings have merit, they would preclude her from being retried for the underlying charges. See United States v. Godin, 534 F.3d 51, 61 (1st Cir. 2008).

In considering a challenge to a conviction based on the sufficiency of the evidence to support it, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We look to "the totality of the evidence, both direct and circumstantial." Id. (quoting United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997)). We will reverse the conviction only if no reasonable juror could find the defendant guilty beyond a reasonable doubt of all the elements of the offense of conviction. See United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015). Our review is de novo. United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015).

We begin by considering López's challenges to the sufficiency of the evidence as to five of her six convictions -- namely, her convictions on Counts Three through Five and Count Eleven, each of which was for a substantive offense, and on Count Two, which was for a conspiracy offense. After explaining why we

conclude that the evidence suffices to support each of those five convictions, we then take up her challenge to the sufficiency of the evidence as to her one remaining conviction, which was on Count One and which like Count Two also concerned a conspiracy offense. There, too, we reject her contention that the evidence does not suffice to support the conviction.

**A.**

To convict López on Count Eleven, which was for federal programs bribery in violation of 18 U.S.C. § 666, the government was required to prove, among other things, that López accepted a thing of value while "intending to be influenced" by it to perform an official act.  18 U.S.C. § 666(a)(1)(B).  To convict her on Counts Three, Four, and Five, which were for honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, the government was required to prove, among other things, that she acted "with the specific intent to defraud." Woodward, 149 F.3d at 54 (quoting United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996)).  That mental state may be established by proving the defendant had a "bribery-like, corrupt intent" to deprive the public of honest services.  Sawyer, 85 F.3d at 730.

There remains López's conviction on Count Two, in which she was charged with conspiring to commit honest services wire fraud in violation of 18 U.S.C. § 1349.  The government does not argue, however, that this conviction, which is for a conspiracy

offense, could stand even if the evidence at trial is insufficient to establish that López had the intent required to prove she committed the predicate offense, which is honest services wire fraud.

Thus, for López's convictions on each of these five counts, including the one that charged her with committing a conspiracy offense, the government accepts that it was required to prove beyond a reasonable doubt the following: (1) that López accepted various benefits from Hernández with the intent to be influenced by them in the performance of her official duties running ADL; and (2) that in performing those duties she steered contracts from ADL to companies affiliated with Hernández in return for the benefits that he provided to her.

López, for her part, concedes that her sufficiency challenges to these five convictions fail if the evidence suffices to prove that she received the things of value that Hernández provided to her with the intention to be influenced by them to use her authority at ADL to steer the contracts at issue to the entities affiliated with him. Moreover, we do not understand López to be disputing that the government could prove that she had such an intent based on what is known as a "stream of benefits" theory, by which the government may "prove an agreement for the ongoing stream of benefits rather than . . . for stand-alone bribes" and so is not required to "link the value of the government business

- 11 -

conferred to any particular benefit received by the official." United States v. Lopez-Cotto, 884 F.3d 1, 8 (1st Cir. 2018); see id. at 8 n.5 (noting the applicability of the "stream of benefits" theory to honest services fraud). Nor, for that matter, do we understand López to be disputing that the government could prove the charges set forth in these counts by showing that she received the stream of benefits in return for taking a series of official acts rather than any official act in particular. See United States v. McDonough, 727 F.3d 143, 154 (1st Cir. 2013) ("Bribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor." (alterations and quotation marks omitted) (quoting United States v. Ganim, 510 F.3d 134, 149 (2d Cir. 2007))); id. at 152-53 ("It is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose." (quoting United States v. Terry, 707 F.3d 607, 612 (6th Cir. 2013))); Ganim, 510 F.3d at 147 (Sotomayor, J.) ("Once the quid pro quo has been established . . . the specific transactions comprising the illegal scheme need not match up this for that. While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case -- for example, because the

- 12 -

opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests."); United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998) ("[T]he intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that.'"); see also Skilling v. United States, 561 U.S. 358, 367, 412 (2010) (interpreting §§ 1343 and 1346 as a "prohibition on fraudulently depriving another of one's honest services by accepting bribes or kickbacks").

Thus, López's sufficiency challenges to her convictions on these five counts turn on what the record shows about her intent to be influenced in the performance of her duties running ADL by the stream of benefits that she received from Hernández. We therefore now turn to a review of what the record shows on that score.

López is right that there was no direct evidence introduced at trial that demonstrates that she had the requisite intent in the relevant respect. But, it is clear that a rational juror could supportably find on this record that López, while running ADL, signed agency contracts and amendments to agency contracts with entities affiliated with Hernández and his business partners that collectively were worth more than $1,000,000. It is equally clear that a rational juror could supportably find on this

record that, during the period of time in which ADL awarded the contracts at issue to those entities, Hernández, who had helped bring about López's nomination to be administrator, bought her meals, champagne, shoes, three designer purses, a Mont Blanc book, and an iPhone and met and corresponded with her regularly. Moreover, López does not dispute that, as to each of these convictions, the evidence suffices to support a finding that Hernández possessed the requisite corrupt intent in providing this stream of benefits to her in order to obtain the contracts from ADL.

López nevertheless contends that the evidence did not suffice to support the necessary finding regarding her intent with respect to any of these five convictions, because she argues that the record reveals that there are innocent explanations for the date of receipt of some or all of the things of value that Hernández provided to her. For example, she argues that the iPhone she received from Hernández on February 19, 2014, was a Valentine's Day gift, and thus does not provide a basis for drawing an inference about her intent in approving a contract amendment worth $659,500 on February 26, 2014. She makes similar arguments as to the timing of the other gifts that she received from Hernández.

But, López's focus on whether the temporal proximity of the receipt of the gifts to the awarding of the contracts supports the necessary inference regarding her intent is misplaced. Even

if she were right that the evidence of timing in and of itself could not suffice to support such an inference about her intent (a position about which we take no view), the record contains evidence from which a rational juror could supportably find that López used her position as the head of ADL to afford preferential treatment to Hernández-affiliated entities during the time period in which he provided her with the stream of benefits. For example, Heidi Rosado Nieves ("Rosado"), an ADL employee who worked directly for López in 2013 and 2014, testified that invoices for entities affiliated with Hernández were processed more quickly than those for other vendors and that the directive to provide "preferential treatment was coming from . . . López." Rosado further testified that another employee of ADL informed her that "you don't give [Hernández] instructions" and that she discovered over time that Hernández was "untouchable" within the agency.

Nor was Rosado's testimony about this favoritism merely of a general character. Rosado testified more specifically about an incident in which she refused to approve the funds for a JMP contract because it was overpriced and López informed her that she had to sign the invoice because López had reached an off-book, unspecified agreement with JMP to provide "additional things." In addition, Rosado testified that another one of JMP's contracts was amended on multiple occasions, without going through the proper

legal channels at ADL, even though the firm had failed to submit the follow-up data it was contractually obligated to provide.

This evidence of preferential treatment, when combined with the evidence of the timing of the receipt of the benefits and the awarding of the contracts, suffices to permit a rational juror to reject the more benign account of López's state of mind in receiving those benefits that she contends is the only one that a rational juror could credit. The evidence as a whole instead permits the reasonable inference that there was an agreement between López and Hernández to provide him and the entities affiliated with him the favorable treatment just described with respect to the ADL contracts at issue in return for the benefits that she received from him while running that agency. As a result, a rational juror could supportably reject López's contention that the benefits Hernández provided were "merely a reward for some future act that [she would] take . . . or for a past act that [s]he ha[d] already taken." United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 405 (1999).

The inference that there was an agreement between López and Hernández regarding the steering of ADL contracts in return for the stream of benefits would, to be sure, be based on circumstantial rather than direct evidence. But, that feature of the evidence does not make it insufficient. "[E]vidence of a corrupt agreement . . . is usually circumstantial, because bribes

are seldom accompanied by written contracts, receipts or public declarations of intentions." McDonough, 727 F.3d at 153 (quoting United States v. Friedman, 854 F.2d 535, 554 (2d Cir. 1988)); see also United States v. Wright, 665 F.3d 560, 569 (3d Cir. 2012) ("Parties to a bribery scheme rarely reduce their intent to words, but the law does not require that."). We thus reject López's sufficiency challenges to these five convictions.

**B.**

That brings us, then, to López's sufficiency challenge to her sole remaining conviction, which is for Count One. That count charged her with conspiracy under 18 U.S.C. § 371 to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 or federal programs bribery in violation of 18 U.S.C. § 666. The count alleged that López was a participant in a conspiracy with Hernández, Muñiz, Barreto, and Ivonne Falcón to "utilize the public officials' positions within the government of the Commonwealth of Puerto Rico to benefit and enrich themselves through bribery."

López does not dispute that if the evidence suffices to show that, as the count alleges, she conspired with the individuals named above to steer an AAA contract funded by ADL to an entity affiliated with Hernández in return for his providing a stream of benefits to López, Ivonne Falcón, and Barreto, then the evidence

- 17 -

would suffice to sustain this conviction.  Accordingly, we will now consider what the record shows in that regard.

López does not dispute that the evidence in the record suffices to establish that Hernández was providing a stream of benefits to each of Ivonne Falcón and Barreto, who were both officials at AAA, in exchange for their providing entities affiliated with him preferential treatment in the bidding process for contracts awarded by that agency.  She also does not dispute that the evidence in the record suffices to prove that those benefits were in fact conferred and that Ivonne Falcón and Barreto accepted them with the requisite intent to be influenced in taking official acts.  Furthermore, López does not dispute either that, during this same time span, she also received from Hernández a stream of benefits, which we described above in connection with her convictions on the five other counts at issue, or that the evidence suffices to show he provided those benefits to her to influence her in his favor in her performance of her official duties at ADL.

Nonetheless, López contends that the evidence does not suffice to show that she participated in the alleged scheme to steer the ADL-funded AAA contract to an entity affiliated with Hernández because her conduct in relation to AAA's award of that contract was not "illegal, or even irregular" in any respect.  We are not persuaded.

To start, Hernández testified at trial about a meeting that he had with Ivonne Falcón, Barreto, and Eder Ortiz ("Ortiz"), an electoral commissioner and former senator, in which Ortiz came up with a scheme to have ADL provide funding to AAA that AAA then could use to award a contract to train new employees of AAA to a company affiliated with Hernández, Links Group. In addition, the evidence at trial supportably shows that this meeting occurred while Hernández was providing a stream of benefits not only to Ivonne Falcón and Barreto but also to López herself. And, Hernández testified at trial that he and Ortiz presented López with the scheme that had been discussed at the earlier meeting and "she said yes, she was interested, since for the agency it would be a creation for new jobs."

What is more, there also was testimony at trial that López subsequently met with all the alleged coconspirators to discuss a transfer of funds from ADL to AAA so that AAA could fund the contract with Hernández's company. In particular, Hernández testified that he met with López, Ivonne Falcón, Barreto, Ortiz, and Muñiz to "talk[] about the possibility of seeing how . . . [they] could make this project work."

Indeed, López acknowledges that the evidence supportably shows that, following that meeting, she provided a sample letter that had been used in the past to obtain approval for inter-agency use of funds to help facilitate this plan to have AAA retain Links

Group.  And, further, the government introduced evidence at trial that supportably shows that López intervened to ensure that ADL would continue to fund AAA's contract with Links Group as planned, even in the face of concerns having been raised by her staff. Specifically, López's aide at ADL, Rosado, testified that even though the contract between AAA and Links Group at issue was "really difficult" to audit and put the agency at "risk" of losing money, López insisted that the contract would remain in effect, that Links Group would continue to provide the services in question, and that the subject was not up for debate.

Thus, we see no merit to López's contention that there was "no proof that she was even aware of . . . Hernández'[s] other schemes" involving AAA and no proof that she acted corruptly in connection with the ADL-funded AAA contract at issue.  Rosado's testimony provides support for a reasonable juror to find that López took unusual steps to intervene to ensure that the ADL funding would be provided to AAA and that she did so <u>after</u> she had met with Hernández, Ortiz, Muñiz, Ivonne Falcón, and Barreto in regard to the plan to guarantee that those funds would be available to pay for a contract with an entity affiliated with Hernández. And, the record supportably shows that López took those unusual steps at a time when she, Ivonne Falcón, and Barreto were all receiving benefits from Hernández that he gave to them to influence

their performance of their duties in his favor at their respective agencies.

From this collection of evidence, considered as a whole, a reasonable juror supportably could infer that López, contrary to her contention, was not only aware of the scheme involving ADL and AAA as a result of her meeting with the other alleged coconspirators about it but also that, in the wake of that meeting, she willingly took steps to assist them in carrying it out both by providing the sample letter and by overriding internal concerns within her own agency about the transfer of funds to AAA that would make the Links Group contract possible. See United States v. Santos-Soto, 799 F.3d 49, 59 (1st Cir. 2015) (explaining that "a defendant must know that a conspiracy exists and that his participation, even if limited to a peripheral service, is designed to foster that conspiracy").[5]

## III.

We now turn to López's other contentions, through which she seeks to vacate rather than reverse her convictions. We begin

---

[5] López also points out that Links Group ultimately "did not benefit at all from the contract." However, it is well established that "a conviction for conspiracy does not require that the defendant was successful in the underlying offense, but only that an agreement to commit the underlying offense existed, and that at least one co-conspirator committed an overt act in furtherance of the conspiracy." United States v. Martin, 228 F.3d 1, 13 (1st Cir. 2000) (citations omitted). The evidence was sufficient for the jury to conclude that as much occurred here, regardless of the ultimate impact of the agreement on Links Group's finances.

- 21 -

-- and, as it happens, end -- our consideration of these challenges with the ones that she brings under Rules 8 and 14 of the Federal Rules of Criminal Procedure. As we will explain, we conclude that her Rule 14 challenge to the District Court's refusal to grant her a separate trial from one of her codefendants -- Rivera, who was an official in the Puerto Rico House of Representatives -- requires that each of her convictions must be vacated due to the prejudicial evidence to which the jury in her case was exposed in consequence of her being tried jointly with that codefendant. As a result of our holding on that score, we do not consider any of her other challenges, including the additional ones that she brings under Rule 14 with respect to her joint trial with her other codefendants or under Rule 8, whether concerning the joinder of her counts with those naming Rivera or with those counts naming any of her other codefendants. Nonetheless, to set the stage for assessing her challenges under Rule 14 to her convictions based on her joint trial with Rivera, it is useful briefly to set forth the relevant legal principles relating to both that rule and Rule 8(b).

## A.

Rule 8(b) authorizes the joinder of two or more defendants in an indictment if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The rule does not require that every count

charge every defendant -- the "defendants may be charged in one or more counts together or separately." Id. What Rule 8(b) does require is "some common activity" that binds the indictees and that "encompasses all the charged offenses." United States v. Azor, 881 F.3d 1, 10 (1st Cir. 2017) (quoting United States v. Natanel, 938 F.2d 302, 307 (1st Cir. 1991)).

We have explained that "[a] conspiracy count can be a sufficient connecting link between co-defendants and separate substantive offenses to permit their joinder in a single indictment." United States v. Luna, 585 F.2d 1, 4 (1st Cir. 1978). Moreover, multiple conspiracy counts may themselves be part of "the same series of acts or transactions," Fed. R. Crim. P. 8(b); see, e.g., United States v. Grassi, 616 F.2d 1295, 1303 (5th Cir. 1980); Bost v. United States, 178 A.3d 1156, 1184-85 (D.C. 2018), even if only because they are part of a larger uncharged scheme or plan, see, e.g., United States v. Wadena, 152 F.3d 831, 848-49 (8th Cir. 1998).

We evaluate misjoinder from the face of the indictment rather than from the evidence introduced at trial. See Natanel, 938 F.2d at 306. A Rule 8(b) violation can be "harmless" if it "did not result in 'actual prejudice.'" United States v. Edgar, 82 F.3d 499, 503-04 (1st Cir. 1996) (quoting United States v. Lane, 474 U.S. 438, 449 (1986)). "Actual prejudice in this context means 'the substantial and injurious effect or influence in determining

- 23 -

the jury's verdict.'" United States v. Zimny, 873 F.3d 38, 59 (1st Cir. 2017) (quoting United States v. Ponzo, 853 F.3d 558, 568 (1st Cir. 2017)). We review a claim of misjoinder under Rule 8(b) de novo. Id.

As a general matter, if joinder is proper under Rule 8(b), then "those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources." United States v. DeCologero, 530 F.3d 36, 52 (1st Cir. 2008) (quoting United States v. Soto-Beníquez, 356 F.3d 1, 29 (1st Cir. 2003)). But, even still, Rule 14 of the Federal Rules of Criminal Procedure does provide that, in some cases in which Rule 8(b) is satisfied, a joint trial may be improper in consequence of the prejudice it may cause. See Fed. R. Crim. P. 14.

To be sure, Rule 14 does not necessarily require severance "even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro v. United States, 506 U.S. 534, 538-39 (1993). Severance is required under Rule 14, in other words, only if a defendant can establish that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539.

Thus, to prevail on appeal in a challenge to a denial of a Rule 14 motion, the burden is on the defendant not only to establish prejudice but "to make a strong showing" of the same. United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) (emphasis added) (quoting United States v. Porter, 764 F.2d 1, 12 (1st Cir. 1985)). "This is a difficult battle for a defendant to win," id., because a district court is entitled to "considerable latitude" in evaluating such a claim, Natanel, 938 F.2d at 308. Consistent with those principles, we have noted that there is always a risk of some degree of "garden variety" prejudice in any joint trial and that prejudice of that sort cannot "in and of itself . . . suffice" to carry a defendant's burden to establish that failure to sever was an abuse of discretion. Boylan, 898 F.2d at 246. Indeed, we have explained that "[w]here evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." United States v. Floyd, 740 F.3d 22, 37 (1st Cir. 2014) (quoting United States v. O'Bryant, 998 F.2d 21, 26 (1st Cir. 1993)). We review the denial of a severance motion under Rule 14 for abuse of discretion. Zimny, 873 F.3d at 59.

Finally, we note that our inquiry into whether evidence would be independently admissible against the defendant seeking severance is guided by the indictment, which sets the outer limits

of the permissible basis for conviction, see United States v. McBride, 962 F.3d 25, 32 (1st Cir. 2020), and of what the government may endeavor to prove at trial, see United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985). In evaluating the indictment's reach, we read it "in a plain and commonsense manner," United States v. Mubayyid, 658 F.3d 35, 70 (1st Cir. 2011), focusing on the text and what it reveals about the scope of the crimes the grand jury intended to charge, see United States v. Miller, 471 U.S. 130, 142-43 (1985); United States v. Pierre, 484 F.3d 75, 82 (1st Cir. 2007); see also United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001) ("Adherence to the language of the indictment is essential . . . ."); United States v. Roshko, 969 F.2d 1, 6 (2d Cir. 1992) ("[W]e are unpersuaded by the government's contention that when the grand jury wrote 'an alien' it really meant 'aliens' . . . .").

**B.**

Against this background, we now take up López's Rule 14 challenge concerning the denial of her request that her trial be severed from Rivera's. In doing so, we recognize that the District Court stated in rejecting López's original motion under Rule 8(b), which concerned the improper joinder of her counts with codefendants including Rivera, that "the acts charged [were] part of an over-arching conspiracy" linking the various counts. But,

as we have just explained, whether Rule 14 was violated does not depend on whether Rule 8(b) was.

Here, the District Court did conclude that the various offenses charged in the sprawling indictment each related to a "master scheme" that had a pyramid structure with Hernández at the top. But, we do not understand the District Court to have ruled that López and Rivera were in fact charged with being coconspirators in any count contained in the indictment. And, consistent with that understanding, the government expressly represents to us on appeal that the two were charged only with distinct offenses, even though López was charged in one of the counts with conspiring with another of her codefendants.

Thus, in accord with a "plain and commonsense" reading of the indictment, Mubayyid, 658 F.3d at 70, we proceed in reviewing López's Rule 14 challenge on the understanding that she does not need to overcome the particularly formidable hurdle that faces a defendant seeking severance from a codefendant with whom she has been charged with conspiring, see United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998) ("[I]n the context of conspiracy, severance will rarely, if ever, be required." (quoting United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995))). Nonetheless, the government argues here that López's challenge to the District Court's refusal to grant her a separate trial from Rivera must be rejected because any prejudice that López suffered

from the joint trial was either of the sort to be expected in any joint trial or of the sort that, in light of the evidence independently introduced against her and the instructions given to the jurors, was too slight to permit a contrary conclusion. We disagree.

The jury before which López was tried was exposed to days of detailed evidence regarding Hernández's role in corrupting the contract bidding process at the Puerto Rico House of Representatives, where Rivera worked, to benefit entities affiliated with him. The government's showing in that regard included the presentation of direct evidence of the corrupt intentions of those alleged to have been involved in rigging that bidding process. For example, the evidence included testimony from Víctor Burgos Cotto, who was the Director of Technology at the House during the time in question and a witness for the government, recounting that Rivera had told Burgos that Burgos "had to find a way to help friends" like Hernández in the contracting process and that failure to do so would result in termination.[6]

---

[6] Burgos's testimony ran across three days of trial, during which Burgos told the jury about how Rivera, González, and the Speaker of the House had overtly pressured him to select Hernández's company as a contract vendor despite the inferiority of the company's proposals and its employees' lack of expertise with the subject matter.

But, López was not herself employed by the Puerto Rico House of Representatives, let alone charged with any offense pertaining to the corruption of that bidding process. We thus cannot see how evidence of such depth and quality about the nature of the allegedly corrupt scheme at the Puerto Rico House of Representatives in which Rivera was charged with having a role could have been admitted at a trial against López alone on the counts that she faced. For, even if such evidence might have been relevant to the counts that she faced independently of Rivera to prove Hernández's intent in supplying benefits to her as the head of ADL, the admission of that evidence in a trial of López alone still would have been limited by Federal Rule of Evidence 404(b)[7] and limited, too, by Federal Rule of Evidence 403.[8] And that is especially so given that Hernández's intent was not in dispute as to any of the counts involving López. After all, he had pleaded guilty to the ADL- and AAA-related counts that he faced prior to López's trial, and he testified at the trial that the reason that

---

[7] Federal Rule of Evidence 404(b)(1) provides: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

[8] Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

he provided benefits to public officials was to induce their assistance in his business dealings.

Nor does the government contend otherwise. It notably makes no argument in response to López's Rule 14 challenge on appeal that the evidence concerning Rivera and the Puerto Rico House of Representatives scheme was itself relevant to any of the charges that López herself faced. To the contrary, it premises its contention about the lack of spillover prejudice from that evidence on what it contends was the distinct nature of the offenses that each of these two defendants faced and the correspondingly distinct nature of the evidence that was relevant to those offenses. According to the government, in consequence, a jury could easily compartmentalize the evidence put forward regarding Rivera from that relevant to the case against López. And, in further support of that contention, it characterizes the case against López on her charges as strong.

We have already explained, however, that the case against López in the six counts that she faced regarding whether she had the intent to be influenced by the benefits that Hernández supplied to her -- which the government concedes it was required to show -- was circumstantial. Indeed, López's primary defense to the charges against her was that Hernández acted corruptly and intended to influence her but that she merely accepted gifts from him without any sort of quid pro quo. For that reason, the evidence

about how Hernández corruptly schemed with others in connection with the Puerto Rico House of Representatives that could not have been introduced at a trial against her alone but to which her jury nonetheless was exposed did create a grave risk of spillover prejudice. Specifically, that evidence risked leading the jury in considering her charges to impute the states of mind of the employees of the Puerto Rico House of Representatives -- based on the direct evidence of their intent that was introduced -- to López and thereby "prevent[ing] the jury from making a reliable judgment about [her] guilt or innocence." Zafiro, 506 U.S. at 539.

The District Court did give limiting instructions, as the government emphasizes, but they did not suffice to mitigate this risk of spillover prejudice. Cf. DeCologero, 530 F.3d at 56 (citing Zafiro, 506 U.S. at 540-41).[9] The joint trial enabled the government to put forth direct evidence of the corrupt intent of Hernández's collaborators in a distinct scheme, even though the government had only circumstantial evidence as to López's state of mind and the trial both implicated a number of players and involved

---

[9] The District Court instructed the jurors that they "must give separate consideration to each individual defendant as to each separate charge against him or her," and that "[e]ach defendant is entitled to have his or her case determined from his or her conduct and from the evidence that may be applicable to him or her." López does not take issue with the wording of that instruction but instead contends that no such "separate consideration" instruction, regardless of formulation, would have been adequate to defray the risk of prejudice.

a number of complicated charges.  Cf. O'Bryant, 998 F.2d at 26 n.5 (upholding a denial of severance where "the charges were fairly simple" and "the case involved only two defendants and four counts").  Adding to our concern is the fact that the prosecution's presentation of its case repeatedly blurred the lines between the schemes.  For example, the prosecution asked Hernández during his testimony whether he was "working those proposals" -- namely, one of the ADL contracts and the telecommunications contract with the House -- "at more or less the same time frame," and it introduced evidence about those schemes back-to-back.  Thus, the risk that spillover prejudice occurred because the jury was unable to distinguish between the two schemes was heightened.  Cf. United States v. Drougas, 748 F.2d 8, 18-19 (1st Cir. 1984) (considering the trial court's careful differentiation between allegations and evidence against the coconspirators when evaluating the risk of jury confusion).

Of course, we have been "reluctant" to overturn severance denials.  Azor, 881 F.3d at 12 (quoting Boylan, 898 F.2d at 246).  But, as López rightly notes, prejudice from being tried jointly "can come in various forms, including jury confusion, the impact of evidence that is admissible against only some defendants, and 'spillover' effects where the crimes of some defendants are more horrific or better documented than the crimes of others."  United States v. Innamorati, 996 F.2d 456, 469 (1st Cir. 1993).

And, we are persuaded that this is the rare case in which "[t]he dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, [were] so great" as to require severance. Kotteakos v. United States, 328 U.S. 750, 774 (1946).

Our conclusion is bolstered by the fact that this is not a case in which the results of the trial might be thought to undermine any claim of prejudice. Every codefendant who went to trial was convicted on every charged count, underscoring the possibility that the effects of the joint trial were damaging. Cf. Zimny, 873 F.3d at 60 (noting that an acquittal on a subset of the charged counts "helps undercut an actual-prejudice claim" (quoting Ponzo, 853 F.3d at 569)); DeCologero, 530 F.3d at 56 (explaining that the "highly individualized verdicts" returned by the jury, where "there were some charges for which the jury acquitted all defendants, and others for which the jury convicted some defendants while acquitting others . . . were not the verdicts of a jury confused about the identity and culpability of the individual defendants").

The government does invoke a number of precedents in support of its argument that "there was no risk that the jury would have held López guilty for the . . . acts of a different conspiracy." But, the government exposed López's jury to days of evidence of how other public officials in a complex alleged public

- 33 -

corruption scheme in which López herself was not charged acted corruptly on behalf of the very figure (Hernández) who was alleged to have corruptly influenced López during roughly the same time period in the alleged corruption scheme for which she was charged. And, the concerning exposure to that evidence occurred even though the central evidence in the case against López regarding whether she had been corruptly influenced by that figure was entirely circumstantial in nature. None of the cases to which the government points in contending that the risk of prejudice from the exposure of López's jury to days of Rivera-related evidence was minimal presents the kind of concerns that trouble us here. See United States v. De La Cruz, 514 F.3d 121, 139-40 (1st Cir. 2008) (rejecting a claim brought "with little attempt at developed argument" that the jury may have attributed guilt to the defendant based on allegations involving a separate conspiracy where that evidence was limited, easy to separate out, and the court carefully instructed the jury on the evidence it could consider); United States v. Warner, 690 F.2d 545, 553 (6th Cir. 1982) (rejecting a severance claim where the prosecution charged a single conspiracy, the evidence "was fairly straightforward and was unlikely to confuse the jury," and "[t]he jury's verdict show[ed] that it followed the[] [jury] instructions, making an individualized determination" and acquitting the defendant of one substantive count); United States v. Losing, 560 F.2d 906, 911-12 (8th Cir.

1977) (rejecting a severance claim where the codefendants were charged in a single conspiracy); <u>United States</u> v. <u>Kenny</u>, 462 F.2d 1205, 1218 (3d Cir. 1972) (rejecting a severance claim where "the granting of separate trials would not have significantly benefited the defendants who now complain").  Thus, we conclude that the District Court abused its discretion in declining to sever López's trial from that of Rivera and that the resulting prejudice was such that her convictions may not stand.

## IV.

We conclude that López's Rule 14 challenge to her joint trial with respect to Rivera has merit.  We thus need not reach her other arguments as to why a new trial or a resentencing proceeding is warranted, as we conclude that, based on the merit of that challenge alone, we must **vacate** the judgment of conviction as to each of the six counts on which she was convicted and **remand** the case for a new trial.